Wanamaker, J.
The writ of prohibition is a writ new to Ohio jurisprudence. It was adopted in 1912 as a part of the judicial article and is found in Section 2, Article IV of the Constitution, in the following language:
“It [the supreme court] shall have original jurisdiction in quo warranto, mandamus, habeas corpus, prohibition and procedendo, and appellate jurisdic *270 tion in all cases involving questions arising under the constitution of the United States or of this state, in cases of felony on leave first obtained, and in cases which originated in the courts of appeals, and such revisory jurisdiction of the proceedings of administrative officers as may be conferred by law.”
The definition generally recognized in those jurisdictions in which this writ has long been in use is as follows:
“The writ of prohibition, is an extraordinary judicial writ issuing out of a court of superior jurisdiction and directed to an inferior tribunal properly and technically denominated such, or to an inferior ministerial tribunal possessing incidentally judicial powers and known as a quasi-judicial tribunal, or even in extreme cases to a purely ministerial body, commanding it to cease abusing or usurping judicial functions. A writ of prohibition is a prerogative writ to be used with great caution and forbearance for the furtherance of justice, and for securing order and regularity in all the tribunals where there is no other regular and ordinary remedy. The legitimate scope and purpose of the writ is to keep inferior courts within the limits of their own jurisdiction, and to prevent them from encroaching upon the jurisdiction of other tribunals.” (32 Cyc., 598). “This writ is of English origin, being one of the great common-law prerogative writs long in use.” (/&., note 2),
High, in his excellent work Extraordinary Legal Remedies, clearly states the prevailing doctrine, wherever the.writ is in general use, and enumer *271 ates three conditions necessary to warrant the granting of relief through the writ of prohibition. They are as follows:
“1. That the court, officer or person against whom it is sought is about to exercise judicial or quasi-judicial power.
“2. That the exercise of such power is unauthorized by law;
“3. That it will result in injury for which no other adequate remedy exists.” (Section 764a).
In the same section High also announces the doctrine —
“And the remedy may be invoked against any body of persons or officers assuming to exercise judicial or quasi-judicial powers, although not strictly or technically a court.”
“The province of the writ is not necessarily confined to cases where the subordinate court is absolutely devoid of jurisdiction, but it is extended to cases where such tribunal, although rightfully entertaining jurisdiction of the subject-matter in controversy, has exceeded its legitimate powers.” (Section 781).
The first question that naturally arises is this: Was the defendant, the state liquor licensing board, “about to exercise judicial or quasi-judicial power,” “although not strictly or technically a court?”
It is conceded by both sides of this case that charges of misconduct in office had been presented and filed with the defendant board against the relator; that a trial was to be had and that a judgment was to be entered, which, according to the' *272 statute, was to be final, and that such judgment might be an ouster or removal from office.
In this view of the case it would seem almost absurd to contend that the defendant board was not about to exercise “quasi-judicial power,” and, though not a court, it was such an inferior tribunal or body as rendered it subject to the writ of prohibition if a proper case had been presented to such board, as to matters of jurisdiction.
It has already appeared from the language quoted from the constitution that the general assembly is vested with power to confer revisory jurisdiction upon the supreme court as to the action of administrative heads or boards, such as the state liquor licensing board, and it is conceded upon all hands that no such provision has been made. It is, therefore, contended that the legislature’s failure in this behalf renders the action of the board exclusive and final.
The effect of this contention, however, would be to deny to the supreme court the original jurisdiction conferred in the constitution with reference to the writ of prohibition. The failure of the legislature to provide revisory jurisdiction, which is in its very nature akin to appellate jurisdiction, can scarcely be claimed to nullify the original jurisdiction conferred upon the supreme court by the constitution. Of course, had such revisory jurisdiction been conferred, the relator would have been required to avail himself of such remedy, providing that the same was adequate.
We come now to consider the question as to whether or not the inferior tribunal named — that *273 is, the State liquor licensing board — was about to exercise powers outside of its jurisdiction, or to exceed its powers in a matter in which it has certain particular jurisdiction.
Certain written charges were filed against the relator, Nolan, before the state liquor licensing board. Those charges fully appear in the statement. Boiled down they are as follows:
1. “Guilty of misconduct in office in taking part, other than by voting in an election involving the prohibition and numerical limitation of saloons.”
2. Guilty of misconduct in office by reason of his distributing and circulating referendum petitions among the voters on the McDermott liquor licensing law.
3. Misconduct in office by reason of distributing and circulating said petitions on said McDermott liquor licensing law with the agreement, understanding and purpose “of procuring employment thereafter through the mutual aid and influence of such licensing officials as a member of the licensing board of said county.”
There are other charges suggested or winked at, but by reason of their indefiniteness and want of particularity they do not merit discussion in this opinion.
It is nowhere charged in the several complaints against the relator that he was guilty of “bribery,” “incompetency,” any “gross neglect of duty” or “gross immorality.” It is claimed, however, that he was guilty of “misconduct in office” in certain *274 respects detailed at some length in the several written charges.
Upon the general subject of “misconduct in office” the Constitution of Ohio, as adopted in 1912, Article II, Section 38, provides as follows:
“Laws shall be passed providing for the prompt removal from office, upon complaint and hearing, of all officers, including state officers, judges and members of the general assembly, for any misconduct involving moral turpitude or for other cause provided by law,” etc.
It is not claimed in this case that there is any wilful or corrupt act or purpose charged against the relator under the constitutional provision, and it is conceded that if any of the above charges constitute misconduct in office, it must be by virtue of a violation of Section 3 of the liquor licensing act (Section 1261-18, General Code; 103 O. L., 216), or a violation of a certain section of the corrupt practices act, which will be subsequently referred to.
Said Section 3 reads as follows:
“No member or employe of a state or county licensing board shall take any part, except to vote, in any election involving the prohibition or numerical limitation of saloons; and any violation of this provision shall be deemed misconduct in office and such member of such board may be removed therefor by the appointing power.”
Did the McDermott bill, upon which a referendum was sought by said Nolan, as charged, involve “the prohibition or numerical limitation of saloons ?”
*275 The McDermott bill in its gist merely has to do with the administration of the license system, as is admitted by defendants in their brief, as follows:
“It is sufficient to say here that the sole power, authority and function of the state liquor licensing board is the administration of the system of licensing the trafficking in intoxicating liquors * ■* * That is to say, that board has no power, duty or function other than the administration and enforcement of the laws of the state pertaining to the licensing of the trafficking in intoxicating liquors, and in the very nature of things are only an administrative branch of the executive department of the state government, wholly divorced from both the legislative and judicial departments thereof in a most complete sense. In other words, the state board viewed from every conceivable angle can be said to be no more nor less than a purely administrative agency.”
As is the case in most administrative bodies, they exercise certain "quasi-judicial” functions, and in the case at bar the state liquor licensing board was about to exercise such “qMcm'-judicial” power and, therefore, was amenable to the writ of prohibition, providing a cause of action is stated by the relator in his - petition against said defendant board.
Plainly the McDermott bill in itself, by its own terms and provisions, in nowise affected the question of prohibition; it was a legislative provision, to the contrary, providing for a license system and defining the machinery for its administration. Neither were there any terms or provisions in said McDermott law in anywise expressly limiting the *276 number of saloons other than they were already limited under the Greenlund law.
The mere fact that the McDermott referendum was to be had upon the same day as the referendum upon the proposed prohibition amendment to the constitution does not make the McDermott referendum to involve the “prohibition or numerical limitation of saloons.”
It is urged, however, that by reason of a provision of the McDermott bill whereby licenses are granted for a period of two years instead of one year, as under the Greenlund law, that fact brings the McDermott bill within the provision for “numerical limitation of saloons.”
We cannot agree with counsel in this contention. The inclusion is too remote and too technical.
If the McDermott bill had changed the ratio of population as the basis for determining the number of saloons we would have an entirely different case. But it does not do so. Neither has it anything to do with the taking of a census nor as to when a census shall be taken. The question of the number of saloons per population is a matter wholly within the discretion of the legislature, save as limited by the constitutional provision. But the legislature did not undertake to in anywise modify or amend the ratio fixed in the Greenlund law.
Therefore, as to Charge One we find there is no misconduct in office charged against the relator, and as to that charge the state liquor licensing board had no jurisdiction.
As to Charge Two the question in substance is this: Was John F, Nolan, by reason of circulating *277 referendum petitions on the McDermott liquor licensing law, either by himself or with other members of county boards or licensed saloon-keepers, guilty of misconduct in office for which he might be tried and removed from office by the state liquor licensing board ?
Counsel on both sides concede that there is no statute particularly defining the aforesaid acts as misconduct in office. Manifestly, therefore, misconduct in office must be determined from the constitutional reference aforesaid, to-wit, misconduct in office involving moral turpitude, and such interpretations as courts of last resort have given that phrase touching the administration of public office.
Now, the people’s right to the use of the initiative and referendum is one of- the most essential safeguards to representative government. The enemies of the “I. & R.” persistently misrepresent it as destroying representative government, but it is not so. It is rather a guaranty or safeguard to preserve representative government. It is only when government ceases to be representative of the public welfare that the “I. & R.” can be successfully invoked. If the people get real representative government there is no occasion for the “I. & R.” The potential virtue of the “I. & R.”'does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the “I. & R.” rests in the wholesome restraint imposed automatically upon the general assembly and the governor and *278 the possibilities of that latent power when called into action by the voters.
There is nothing new or novel about this power so far as basic principles are involved. It has for more than a century been exercised with reference to constitutions, all of which, before their adoption as the organic law of the state, must first be approved, by a vote of the people.
The “I. & R.,” as to-day understood, simply extends the referendum on constitutions and constitutional amendments to statutes enacted by the state legislature. If the right of referendum is a safe and sane power as to constitutions, it requires more than the ordinary imagination and legal legerdemain to conceive how such right of referendum can be dangerous as to statutes.
In 1912 the people of Ohio adopted the “I. & R.” amendment to their constitution by a majority of more than eighty thousand.
The particular parts in said constitution referring to such right of referendum are as follows:
“Article II. Legislative.
“Sec. 1. The legislative power of the state shall be vested in a general assembly consisting of a senate and house of representatives but the people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt ór reject the same at the polls on a referendum vote as hereinafter provided,” etc. .
*279 “Sec. le. The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly. No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided,” etc.
An examination of the various provisions of the ■constitution shows with what painstaking care the right of referendum was safeguarded, and that provision was made in the constitution expressly denying to the legislature any impairment of the right of referendum in the following words:
“Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved.”
Now, the proposition, boiled down, is this: Is it misconduct in office involving moral turpitude for a public officer to circulate petitions, or to engage others to circulate petitions, or to pay out of his own pocket the necessary expense of the same, in order to give to the people of the state of Ohio the right to a referendum vote upon an act passed by the general assembly of Ohio ?
It is nowhere claimed in any charge that this was corruptly done, or that the relator was guilty of bribery, as known in our statutes, or that there *280 was a violation of any other criminal statute in the doing of the matters set forth in Charge Two.
The question itself seems to furnish its own answer. Can it be possible that when a public officer aids the people in the preparation and circulation of petitions for a referendum, which they have reserved to themselves in their own constitution, such public officer is guilty of misconduct' in office by reason thereof for which he may be removed from office ?
The people have undertaken by statutes to declare that certain .acts denying the people their political rights were crimes, but it would be most extraordinary to find a statute declaring an act to be a crime which facilitated, promoted and protected the people in their right to a vote upon an act of the general assembly under the constitutional referendum.
To deprive one of a right would be a wrong, but to secure or protect one in a right — how can this be said to be a wrong, unless expressly so provided by statute?
Charge Three is substantially the same as the second, with the exception that there is added thereto certain general and more or less vague allegations as to an “agreement, understanding and purpose of suspending and defeating such McDermott law and of procuring employment thereafter through the mutual aid and influence of such licensing officials as a member of the licensing board of said county.”
In view of the fact that the statute itself requires that charges in writing shall be preferred, it only *281 emphasizes the necessity of having such charges reasonably definite and certain.
As to just what is meant by the word “employment” in Charge,Three, it is difficult to determine. Nolan was, at the time, a member of a county liquor licensing board; that is, he held a public office. His term would not expire until the second Wednesday of August, 1917, if the Greenlund law should continue to be the licensing machinery of the state. Taking the charge as a whole, the probable intention and connection of the word “employment” in its relation to the context, “an agreement, understanding and purpose of suspending and defeating such McDermott law,” it is reasonably probable that the employment referred to would be such continued holding of public office as a member of the county licensing board as would naturally and necessarily follow from the defeat of the McDermott law. If the McDermott law were upheld at the referendum, clearly Nolan’s employment, or rather, holding office, as such county liquor license commissioner, would be at an end. If the McDermott law were defeated, he would be continued, at least until the end of his term, under the Greenlund law.
“Employment” of this character is clearly -not within the terms or contemplation of the statute; but wholly aside from such statute, would it be seriously contended that a county officer who endeavors to get a referendum that will bring about an extension of his term, or an administrative officer under some taxing system who interests himself against a referendum, the success of which *282 would terminate the office he was then holding — could it be believed that such public officer, by being so engaged with reference to such referendum, would be guilty of misconduct in office involving moral turpitude, as required by the constitution, because the result upon such referendum, would affect his “employment” or continuance in office? The mere statement of this question suggests its own answer.
The protection and promotion of popular rights have not yet become the basis of private prosecutions.
It is contended in the brief for the defendants that the employment promised in Charge Three violates subdivision 3 of Section 5175-29w, General Code (104 O. L., 122), which reads as follows:
“Whoever, directly or indirectly * * * (3) Promises to help another to obtain appointment to any office provided for by the constitution or laws of Ohio or any municipality therein as a consideration for. obtaining or preventing signatures to an initiative, supplementary or referendum petition; * ■ * * is guilty of corrupt practice.”
As we have already noted, there is no promise pleaded in this charge of appointment or reappointment of said Nolan. The language of the charge is “employment.” But even if it were “appointment,” it would need to be charged that said Nolan was to help “another” to obtain appointment, and clearly, under the conceded facts of this case, that is impossible under the charge.
The mere incidental fact that if the McDermott bill were beaten the Greenlund law would be con *283 tinued upon the statute books, and that under that law Nolan would continue to hold public office or employment, is clearly and conclusively not within the corrupt practices mentioned in said section, and the brief passing notice given to this contention by counsel for the defendants clearly indicates that it is not seriously relied on.
The chief complaint the defendants relied on throughout the charges is that of distributing and circulating referendum petitions on the McDermott law by relator and through his influence and direction as such county liquor licensing commissioner in conjunction with other license commissioners and their licensees.
An.examination of the license system,, as provided in the Greenlund law and in the McDermott law, furnishes abundance of opportunity for honest, patriotic difference of opinion as to the best method of dealing with the licensing of saloons, and the mere fact that one might favor the McDermott bill as against the Greenlund law, or vice versa, does not furnish any satisfactory evidence of either person being wanting in his ideas or ideals of good government, or that he is “wet” or “dry,” for the saloon or against the saloon.
Innocence, honesty of intention, patriotic purpose, may be as well attributed to a person who favors one law as to the person who favors the other law, and it certainly could not be seriously claimed that either position as to either law would be one involving moral turpitude, whether the person favoring or opposing be private citizen or public officer.
*284 The charges are insufficient in law and in fact under the constitution and statutes of the state of Ohio. ,By reason thereof the defendant state liquor licensing board was without authority to hear and determine whether or not said Nolan was guilty of misconduct in office, and the writ of prohibition was available to the relator to prevent a hearing and determination upon such illegal and insufficient charges, said board being without jurisdiction to hear and determine the same.
The writ is accordingly allowed.

Writ allowed.

Nichols, C. J., Johnson, Donahue, Newman, Jones and Matthias, JJ., concur.